Jonathan D. Selbin (State Bar No. 170222)
jselbin@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415-956-1000
Facsimile: 415-956-1008

[Additional attorneys listed on signature page]

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

|  |  |
|---|---|
| PHYLLIS GRODZITSKY, JEREMY BORDELON, STEPHANIE MANZO, SOHAL SHAH, JOYCE YOUNG, CHARITY ANYIAM, JONATHAN PENDARVIS, and DENNIS MASON on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN HONDA MOTOR CO., INC.,<br><br>Defendant. | Case No. 2:12-cv-01142-SVW-PLA<br><br>**Reply in Support of Plaintiffs' Renewed Motion for Class Certification and Appointment of Class Representatives and Class Counsel**<br><br>Date:   August 14, 2017<br>Time:   1:30 PM<br>Ctrm:   10A – Hon. Stephen V. Wilson |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION & SUMMARY ................................................................ 1

II.   THE PROPOSED CLASS AND SUBCLASSES. ................................. 2

II.   PLAINTIFFS SATISFY THE RULE 23 REQUIREMENTS. ............. 3

    A.   Applicable Standards ................................................................ 3

    B.   Commonality is Satisfied. .......................................................... 4

        1.   The Class Regulators Have a Common Design and Common Design Defect. ............................................ 4

        2.   Honda's Failure-Related Arguments Are Irrelevant. ....... 7

            a.   Evidence Shows It Is More Likely Than Not Regulators Failures Caused by Defect. ................ 8

            b.   Variance in Failure Rate Does Not Mean No Common Defect. .......................................... 10

        3.   Plaintiffs' Damages Theory Satisfies Predominance. ......................................................... 11

            a.   Plaintiffs Satisfy *Comcast*. .................................... 12

            b.   *Doyle* Supports Certification Here. ...................... 14

            c.   *Wolin* Supports Certification Here. ...................... 15

        4.   Plaintiffs Establish that Common Issues Predominate as To Their CLRA and UCL Claims. ....... 15

            a.   Materiality. ............................................................. 16

            b.   Reliance. ................................................................. 17

            c.   Causation ................................................................ 19

    C.   The Plaintiffs' Claims Are Typical of the Class. .................... 20

    D.   A Class Action is Superior to Individual Actions. .................. 21

        1.   The Number of Failures is Irrelevant to Superiority. ...... 21

        2.   Plaintiffs' Proposed Trial Structure Supports Superiority. ............................................................ 22

    E.   Plaintiffs Meet the Requirements of Rule 23(b)(2). ............... 23

IV.   CONCLUSION .................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
 133 S. Ct. 1184 (2013) ..................................................................................... 4, 16

*Baghdasarian v. Amazon.com, Inc.*,
 No. CV 05-8060 AG (CTX), 2009 WL 4823368 (C.D. Cal. Dec. 9, 2009) ......... 18

*Briseno v. ConAgra Foods, Inc.*,
 844 F.3d 1121 (9th Cir. 2017) and 674 F. App'x 654 (9th Cir. 2017) ................. 24

*Butler v. Sears, Roebuck & Co.*,
 727 F.3d 796 (7th Cir. 2013) ................................................................... 13, 16, 20

*Carnegie v. Household Int'l, Inc.*,
 376 F.3d 656 (7th Cir. 2004) ................................................................................ 21

*Chamberlan v. Ford Motor Co.*,
 402 F.3d 952 (9th Cir. 2005) ....................................................................... 3, 19, 20

*Cholakyan v. Mercedes-Benz, USA, LLC*,
 281 F.R.D. 534 (C.D. Cal. 2012) .......................................................................... 25

*Comcast v. Behrend*,
 133 S. Ct. 1426 (2013) .......................................................................................... 13

*Daniel v. Ford Motor Co.*,
 806 F.3d 1217 (9th Cir. 2015) ..................................................................... 3, 16, 18

*Edwards v. Ford Motor Co.*,
 603 F. App'x 538 (9th Cir. 2015) ................................................................. 3, 7, 13

*Ehrlich v. BMW of N. Am., LLC*,
 801 F. Supp. 2d 908 (C.D. Cal. 2010) ............................................................ 17, 19

*Engalla v. Permanente Med. Grp., Inc.*,
 15 Cal. 4th 951 (Cal. 1997) ............................................................................ 16, 17

*Falco v. Nissan N. Am., Inc.*,
 No. CV1300686DDPMANX, 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) ........ 23

*Fine v. ConAgra Foods, Inc.*,
 2010 WL 3632469 (C.D. Cal. Aug. 26, 2010)...................................................... 19

*Forcellati v. Hyland's, Inc.*,
 No. CV 12-1983-GHK MRWX, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) .... 16

*Glazer v. Whirlpool Corp.*,
 722 F.3d 838 (6th Cir. 2013) ........................................................................... 4, 13

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) ................................................................................ 3

*Helm v. Alderwoods Grp., Inc.*,
 No. C 08-01184 SI, 2011 WL 855810 (N.D. Cal. Mar. 9, 2011) ......................... 23

*In re ConAgra Foods, Inc.*,
 90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................................................... 24

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practice & Prods. Liab. Litig.*,
 288 F.R.D. 445 (C.D. Cal. 2013)........................................................................... 22

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Vioxx Class Cases*,
  180 Cal. App. 4th 116 (2009) ............................................................. 19

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) .................................................................... 20

*Mass. Mut. Life Ins. Co. v. Superior Court*,
  97 Cal. App. 4th 1282 (2002) ............................................................ 19

*Mazza v. Am. Honda*,
  666 F.3d 581 (9th Cir. 2012) ............................................................... 4

*Mirkin v. Wasserman*,
  5 Cal.4th 1082 (1993) ....................................................................... 16

*Oestreicher v. Alienware Corp.*,
  544 F. Supp. 2d 964 (N.D. Cal. 2008) .................................................. 7

*Parkinson v. Hyundai Motor Am.*,
  258 F.R.D. 580 (C.D. Cal. 2008) ....................................................... 19

*Pella Corp. v. Saltzman*,
  606 F.3d 391 (7th Cir. 2010) ......................................... 7, 22, 23, 24

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) .............................................................. 13

*Suchanek v. Sturm Foods*,
  764 F.3d 750 (7th Cir. 2014) ...................................................... 13, 21

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012) ......................................................... 8

*Tyson Foods v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ...................................................................... 14

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) ........................................................... 13

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009) ............................................................. 21

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ................................................................ 4, 24

*Webb v. Carter's Inc.*,
  272 F.R.D. 489 (C.D. Cal. 2011) ....................................................... 18

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ........................................................... 23

**STATUTES**

Civil Code section 1780 .................................................................... 19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ..................................................................... 2, 21, 25

Fed. R. Civ. P. 23(b)(2) ............................................................... 3, 23

Fed. R. Civ. P. 23(b)(3) ....................................................... 3, 21, 23, 25

## I. INTRODUCTION & SUMMARY

After Plaintiffs filed their motion for class certification, a game-changer happened: Honda belatedly produced documents showing its own pre-litigation internal engineering analysis of the Window Regulators at issue in this litigation. In them, Honda's engineers reached precisely the same conclusion as Plaintiffs' expert did here—the very conclusion that Honda has been denying in this case since 2012––namely that the Regulators share a common design defect that makes them susceptible to failure due to metal fatigue and plastic creep.

In other words, these 2009 internal engineering documents—produced just six weeks ago despite being responsive to requests made three years ago[1]—show that Plaintiffs' allegations are true, that Plaintiffs' class-wide defect theory is correct, and that the common Defect affects not only Regulators in Class Vehicles, but those in other Honda and Acura models that share the same common design.[2] These documents alone undermine the majority of Honda's arguments against class certification. Most critically, they dispose of Honda's twin mantras that there is no common defect, and that Plaintiffs have no new evidence in support of class certification. Everything has changed: there is now unassailable evidence from Honda's own pre-litigation engineering analysis that there is a common defect.

And, it is precisely the Defect Plaintiffs' expert found. Plaintiffs' engineering expert Glenn Akhavein reached the same conclusion as Honda's engineers after extensive testing of the Window Regulators, including laboratory and field testing of static and dynamic forces acting on the Regulators, visual inspection of dozens of Regulators, and laboratory macroscopic and microscopic examination of failed Regulators to determine why and how they failed. It is presumably for this reason

---

[1] *See, e.g.,* Supp. Mem. Pursuant to Local Rule 37-2.3 at 1-2 [Dkt. 316].

[2] These other models – Elements, Accords, MDXs, Odysseys, and CR-Vs – were included in Plaintiffs' prior Motion for Class Certification, which Honda persuaded the Court to deny in part by denying the existence of a defect. It is now evident that Honda was able to make this argument only by failing to disclose these key documents to the Court and the Plaintiffs.

that Honda spends much of its opposition brief repeating its *Daubert* arguments. Both there and here, Honda significantly misstates Akhavein's opinions and testing. As detailed in Plaintiffs' opposition to that motion, Akhavein's opinions are relevant and reliable, and are now confirmed by Honda's own documents.

Together, Honda's late-produced engineering documents and Akhavein's expert opinions based on extensive testing and investigation establish:

1) the Regulators share a common design;

2) the Regulators are insufficiently designed to handle the forces encountered during normal and expected use and conditions;

3) that insufficient design makes the Regulators susceptible to exacerbated metal fatigue and plastic creep;

4) the Regulators fail when the cable-end pulls through the plastic at the cable-ferrule interface due to metal fatigue and creep rupture;

5) the Plaintiffs' Regulators failed via this cable pull-through caused by the Defect; and

6) it is more likely than not that any Class Regulator failure is due to cable pull-through caused by the Defect.

With this newly adduced evidence from Honda's own engineering analysis and Plaintiff's expert Akhavein, Plaintiffs have addressed the concerns raised by the Court in its previous orders, established that the Class Vehicles share a common design Defect, and satisfied all requirements of Rule 23.

Honda's arguments in opposition are by turns incorrect, irrelevant, inappropriate in light of this Court's prior orders, and, most notably, completely ignore the damning evidence contained in its own internal engineering documents. Plaintiffs respectfully request the Court grant their motion.

## II. THE PROPOSED CLASS AND SUBCLASSES.

Plaintiffs propose a class of California owners/lessees of 2003-2008 Honda Pilots (the "Class"), consisting of two overlapping Subclasses: a "Damages

Subclass" and an "Owner/Lessee Subclass."[3]

The Damages Subclass under 23(b)(3) includes all California owners/lessees of 2003-2008 Honda Pilots who paid to replace a failed Window Regulator. The relief sought for the Damages Subclass is payment by Honda of the dollar amount each paid out-of-pocket for replacement of failed a Regulator due to the Defect. Total damages here are simply a total of the amounts the Subclass members paid.

The Owner/Lessee Subclass under Rule 23(b)(2) is broader, and includes *all* California owners/lessees of 2003-2008 Honda Pilots. The relief sought for the Owner/Lessee Subclass is declaratory/injunctive relief finding that Honda is required to cover failures of the Regulators under warranty and ordering it to replace Regulators that fail in the future due to the Defect at no cost to Class members. In effect, this establishes an extended warranty on the Regulators that protects all owners/lessees going forward.

## II.   PLAINTIFFS SATISFY THE RULE 23 REQUIREMENTS.

Plaintiffs meet all Rule 23 requirements. Of particular relevance, they have shown—with reliable and rigorous expert laboratory and field testing, as well as Honda's own documents—that the Regulators share a common design and common Defect, among other common questions. And they have shown that those common questions predominate over any individualized issues, just as they did in similar vehicle design defect cases certified in this Circuit.[4]

### A.   Applicable Standards

While the "rigorous analysis" courts conduct on class certification may

---

[3] *See* Mem. in Support of Plaintiffs' Renewed Motion for Class Certification ("Mot.") at 10 [Dkt. 293-1]; Plaintiffs' Master Class Action Complaint (Fourth Amended Complaint) ("FAC") ¶¶ 148-149 [Dkt. 301].

[4] *See, e.g., Edwards v. Ford Motor Co.*, 603 F. App'x 538 (9th Cir. 2015) (sudden acceleration defect); *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015) (alignment defect); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) (alignment defect); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005) (engine defect); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) (liftgate latch defect).

"entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011), the Supreme Court "admonishes district courts to consider at the class certification stage only those matters relevant to deciding if the prerequisites of Rule 23 are satisfied." *Glazer v. Whirlpool Corp.*, 722 F.3d 838, 851-52 (6th Cir. 2013) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013)).

This Court also expressly instructed that the parties should assume Plaintiffs make a *prima facie* case regarding certain substantive issues, such as existence of the defect, knowledge of defect by Honda, and that the defect presents a safety hazard, which obviates the need to revisit those issues on this motion.[5] Even without that assumption, however, Plaintiffs satisfy the requirements of Rule 23.

### B.  Commonality is Satisfied.

Commonality is a "limited burden;" there need be only one common question to certify a class. *Mazza v. Am. Honda*, 666 F.3d 581, 589 (9th Cir. 2012). Plaintiffs establish commonality with a substantial amount of evidence, including Akhavein's new analysis and testing, as well as Honda's own documents and experts' testimony. The evidence establishes the Regulators all share a common, defective design, plus other common questions.[6]

#### 1.  The Class Regulators Have a Common Design and Common Design Defect.

Honda's recently produced documents provide indisputable evidence that the

---

[5] *See* June 10, 2013, Hrg. Tr. 5:16-5:25 [Dkt. 293-3] ("For the purposes of this Motion, it is assumed that the Lead Plaintiffs have made a prima facie case concerning their claims.); *see also* Minutes on Hearing (Jun. 10, 2013) [Dkt. 76] ("For purposes of the motion of class certification, the parties are to assume that the windows at issue did not work properly; that their failure did present a safety issue; and that Defendant knew that the windows were not working.").

[6] In addition to the common design and common Defect questions, Plaintiffs have shown there are other common questions here, such as whether Honda knew of the Defect; whether Honda had a duty to disclose the Defect; whether Honda concealed and failed to disclose the Defect; and whether Honda's failure to disclose the Defect violated the CLRA and/or the UCL. *See* Mot. 13-14. These are more than enough to satisfy commonality.

Regulators share a common design—not only across the Class Vehicles but also with those in other Honda and Acura vehicles that were part of Plaintiffs' earlier, broader proposed classes. For example, Honda's internal engineering documents indicate its investigation into the cable pull-through failures encompassed ████ ██████████████████████████████████ including the Pilots in the Class as well as Elements, Accords, MDXs, Odysseys and CR-Vs.[7] Because they all share a common design, Honda does not even create unique specifications for them: instead, the design drawings for the Class Regulators refer to specifications for other Honda models with the same common Regulator design.[8]

Plaintiffs' expert analysis and testing, as well as Honda's own documents, show that the Regulators share a common design defect in that they are insufficiently strong and durable to withstand the forces acting on them during normal and expected consumer use (the "Defect"). This Defect makes the Regulators susceptible to failure due to metal fatigue and plastic creep. The manifestation of the Defect is that the plastic breaks at the carrier/ferrule interface, causing the cable-end to pull through and the side window to drop into the door.

As Honda's expert Robert Lange testified, it is critical that automakers design their vehicles (and component parts) to function within—and withstand—the ranges of customer use and environmental conditions to which the vehicle will be subjected in ordinary and expected use.[9] Honda didn't do that here. Akhavein's

---

[7] Martin Supp. Decl. Ex. J, Grodzitsky 51436-83; Ex. L, Grodzitsky 51386-98.

[8] Martin Supp. Decl. Ex. J, Grodzitsky 51482 (noting change to Element (SCV) specification will be updated on drawings for Pilot (S9V), Odyssey (S0X), and CR-V (S9A) because they all ████████████████████████████████ design); Ex. P, 51302-4 (Pilot drawing refers to specification for MDX (S6M) and Accord (S84)); Ex. Q, 51305-8 (Pilot drawing refers to specification for Element (SCV)); Ex. B, Lange Dep. Tr. 89:12-89:22 (confirming Pilot uses specification shared with other Honda/Acura models).

[9] Martin Supp. Decl. Ex. B, Lange 2017 Dep. 30:9-30:23 ("Q When an automotive manufacturer designs a vehicle, the manufacturer must design it such that it is durable enough to handle expected road conditions; would you agree with that? … A: That's certainly the intent of durability programs. That is to subject vehicles

laboratory and real-world testing shows the Regulators, during normal and expected use, experience amplified stresses that exacerbate the destructive effects of plastic creep and metal fatigue.[10] Honda's engineers and expert *agree* with Akhavein that plastic creep and metal fatigue at the carrier/ferrule interface are what ultimately cause the Regulators to fail.[11]

Long before this litigation began, Honda investigated reports of high numbers of Window Regulator failures, and concluded that the failure point is the carrier-ferrule interface: noting that all the ███████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████[12] These 2009 findings by Honda's own engineers match Akhavein's conclusions.

Notwithstanding its own internal 2009 findings to the contrary, Honda has consistently denied the existence of the common Defect to Plaintiffs and this Court since 2012. Now it argues that the Regulators are just parts that wear out over a

---

during the … vehicle development process to a requirement set that will be reflective of some amount of service usage.").

[10] The Regulator supports a window that weighs about seven pounds, but the stresses on the Regulator at the carrier-ferrule interface are amplified and intensified by the normal and expected vibration experienced as the Vehicle is driven, as shown by the resonance Akhavein measured. Because of this amplification, the force actually exerted by the window on the Regulator is often much more than seven pounds, even though the Vehicle is within the range of normal and expected driving conditions. Akhavein Supp. Rep. § 2.2.2; Martin Supp. Decl., Ex. A, Akhavein Dep. Tr. at 61:19-62:2.

[11] Martin Supp. Decl. Ex. J, Grodzitsky 51436-83; Martin Supp. Decl., Ex. B, Lange 6/6/17 Dep. Tr. at 108:1-9.

[12] Martin Supp. Decl. Ex. J, Grodzitsky 51443, 051459, 51470.

long period of time, and that aging is not a defect. Opp. 13.[13] Yet its own documents say otherwise: Honda's investigation was initially spurred by it noticing a high number of Regulators failing during the warranty period, i.e. within first three years or 36,000 miles.[14] The investigation revealed the failures were continuing past the warranty period, and customers were experiencing multiple Regulator failures on the same Vehicle. *Id.* Honda's engineers classified this as a "long term durability issue" because the Regulator's design "does not meet the actual condition experienced" in the real world. *Id.* at 51468. At no point did Honda's engineers ever even suggest this was just routine wear and tear or "aging," as Honda argues now. They called it what it is: a defect.[15]

### 2.      Honda's Failure-Related Arguments Are Irrelevant.

Akhavein's testing and Honda's own documents independently establish the common design Defect. Honda's arguments about the modes and rate of regulator failure are irrelevant to the core question here: whether the Regulators share a common design defect. Failure is just the manifestation of the Defect, its end result. The critical point is that Honda sold the Class Vehicles with defective Regulators. Whether, when, and how any particular Regulator failed is a question of damages, and is irrelevant to the question of whether a common defect exists. *See, e.g., Edwards*, 603 F. App'x at 540-41; *Wolin*, 617 F.3d at 1175 (proof of the manifestation of a defect is not a prerequisite to class certification); *see also Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (finding defendant's argument that wood in window frame could rot for many reasons other than allegedly defective window design did not preclude certification); *Tait v. BSH Home*

---

[13] Honda's citation to *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008) here is inapposite for several reasons, but primarily because here Plaintiffs have shown (and the Court has instructed the parties to assume) that the Defect poses a safety hazard; that was not the case in *Oestreicher*.

[14] Martin Supp. Decl. Ex. J, Grodzitsky 51436-43.

[15] Martin Supp. Decl. Ex. J, Grodzitsky 51436-43, 51470.

*Appliances Corp.*, 289 F.R.D. 466, 479-80 (C.D. Cal. 2012) (rejecting defendant's arguments about alternative explanations for the actual manifestation of the defect in plaintiffs' washers as "simply a red herring").[16]

### a. Evidence Shows It Is More Likely Than Not Regulators Failures Caused by Defect.

Even if Honda's causation arguments were relevant to the class certification question (they are not), they are wholly speculative and unsupported. Honda repeatedly raises the specter of "myriad" other reasons it says the Regulators could fail other than the Defect. But Honda—despite its monopoly on most of the evidence here—has failed to adduce *any* reliable evidence of a widespread failure mode for the Regulators *other* than the common Defect Honda itself identified by 2009. Indeed, the evidence it does marshal overwhelmingly supports Plaintiffs.

First, it is undisputed that the Plaintiffs' failures were caused by the Defect.[17]

Second, Honda's own pre-litigation internal investigation found that at least ██% of Regulator failures were due to the alleged Defect.[18]

Third, the analysis performed by Honda's statistics expert, Dr. Rose Ray, of Honda's VIN-level warranty claims data,[19] which Honda claims provides "vehicle-

---

[16] Indeed, Plaintiffs would be well within their rights—and well-settled caselaw—if they sought to force Honda to pay money damages to every purchaser, not just those whose Regulators failed. That is so because the presence of the Defect in the Regulators at the point of sale establishes both liability and injury, and creates a claim for the difference in value between a defective and non-defective vehicle. For that reason, Honda should be careful what it asks for in its criticisms, addressed below, of Plaintiffs' damages model here.

[17] *See* Opp. 23 ("Plaintiffs … paid for window-regulator failures due to the carrier/ferrule interface issue…"); Martin Supp. Decl. Ex. B, Lange 2017 Dep. Tr. 108:14-109:9 (Plaintiffs' "regulators that failed were -- presented with a fracture at the upper molded-on insert. … it appears as though those were due to repetitive loading. And that's a manifestation of creep failure in polymers. There's some Honda documentation that seems to indicate they think that these kind of failures are creep related. I think they're probably right.).

[18] Martin Supp. Decl. Ex. J, Grodzitsky 051471 (████████████████████████ ██████████████████████████████████████).

[19] Ray's analysis of failure modes is based on Honda's VIN-level warranty claims data, which Ray herself has admitted does not contain complete enough information to conclusively determine failure modes in all instances. Ray Dec. ¶ 17. "The

by-vehicle descriptions of technicians' determination of why a window regulator assembly needed to be replaced," found that 71% of the reported failures could be attributable to the Defect.[20]

Fourth, Plaintiffs' expert visually examined dozens of Class Regulators, including Regulators from Honda's expert's test vehicle and Class Vehicles found at random in junkyards. Not one showed signs of any failure mode *other* than the Defect.[21] Based on his examinations and extensive testing Akhavein testified that "it's more likely than not that a failed Honda regulator is going to have failed because of the design Defect."[22]

Notably, Honda's expert, Lange, despite having access to Honda's engineering department and dealer network, did not even look at any Regulators other than the ones in the Plaintiffs' vehicles (not even those in his own test Pilot).[23]

In light of all of this evidence—much of it Honda's own internal and expert

---

problem with the VIN-level database's nonstandardized text description fields is that it poses a risk of false negatives about a given failure mode (i.e. not containing enough information to discern the cause of failure); it does not create a risk of false positives (i.e. if an entry says 'failed due to cable pull through' there is no reason to think that statement is not reliable)." Wachs Rep. ¶ 7. Honda persists in relying on Ray's VIN-level data analysis, which nevertheless clearly supports Plaintiffs here.

[20] *See* Wachs Rep. ¶ 9 ("Ray finds that 71% of the window regulator warranty claims fall into the top four categories in terms of relevance (as she defines it) to Akhavein's description of the Defect. Therefore, even if Ray's analysis is assumed to be based on reliable methodology (which we do not concede, but simply assume here for the purposes of this point), then statistically speaking her analysis concludes that at least 71% of the Regulator failures within the warranty claims database were due to the Defect.").

[21] Akhavein Supp. Rep. § 1; Martin Supp. Decl. Ex. A, Akhavein Dep. Tr. at 109:1-8 (The "motors weren't failing . . ., pulleys weren't failing, cable, ferrule, the cable pullout from the ferrule itself; didn't see that. What I saw were failures in those areas.").

[22] Martin Supp. Decl. Ex. A, Akhavein Dep. Tr. 212:21-213:1.

[23] Martin Supp. Decl. Ex. B, Lange 2017 Dep. Tr. 18:20-18:23 ("Q: Have you gone at random and looked at a window regulator from a 2003 to 2008 Honda Pilot other than the class representatives' vehicles? A: No."); 19:5-20:12 ("Q: Has anybody … inspected the regulators that were pulled from the Honda test vehicle to determine whether there's any evidence of [the Defect]? A: …I don't think anybody's actually inspected them.").

evidence—that Regulator failures are a result of the Defect, Honda's unsupported speculation that Regulators may sometimes also fail for other reasons, such as vehicle crashes, is insufficient. The possibility of such one-off failures due to "something else" does nothing to change the fact—identified by both Plaintiffs' expert and Honda's own engineers in 2009—that these Regulators suffer a common design Defect that is more likely than not the cause of the overwhelming majority of failures. *See, e.g., Tait*, 289 F.R.D. at 479-80 (certifying class and rejecting defendant's speculation about alternative explanations for the actual manifestation of the defect in plaintiffs' washers as "simply a red herring").

### b.   Variance in Failure Rate Does Not Mean No Common Defect.

Honda's failure *rate* arguments are likewise unsupported. Variances in the failure rates observed in subpopulations (i.e. model years or door positions) of the Class Regulators do not establish that they do not share a common Defect. *See* Wachs Rep. ¶¶ 2-6. As Honda's expert Lange said, "Failure rates are going to be consequent to the precise design manifestation, the unique state of stress at the ferrule-to-carrier interface, the cycle experience that the vehicle has had in terms of windows up/down and in terms of environmental conditions".[24] This is just common sense—vehicles are going to experience different uses and environmental conditions within the normal and expected range of customer use. That is precisely why manufactures must design their vehicles and component parts to perform within the entire range of normal and expected real-world uses and conditions.[25] Contrary to Honda's argument, neither Plaintiffs nor their expert ever said that the Class Vehicles are subjected to identical uses, conditions, or operating loads, nor that the Class Regulators have (or should be expected to have) identical failure rates. Akhavein's testing and Honda's own documents confirm that the Regulators

---

[24] Martin Supp. Decl. Ex. T, Lange 2013 Dep. Tr. 151:4-151:15.

[25] Martin Supp. Decl. Ex. B, Lange 2017 Dep. 30:9-30:23.

1    share a common design Defect. That the manifestation rate of that Defect varies

2    within the population of Class Vehicles makes sense and does not defeat

3    commonality.[26]

4                                   *        *        *

5            In sum, Plaintiffs show—through extensive expert laboratory and field

6    testing and Honda's own internal engineering investigation into Regulator

7    failures—ample evidence of a common design and common design defect. Honda's

8    opposing arguments are without merit and do not defeat commonality.

9                    **3.      Plaintiffs' Damages Theory Satisfies Predominance.**

10           For purposes of the Rule 23(b)(3) Damages Subclass, Plaintiffs seek to

11   recover the cost to replace any Regulator that failed due to the Defect. This is a

12   proper measure of damages stemming from Honda's alleged bad conduct; i.e.,

13   selling cars with defective Regulators. Honda argues class certification is

14   inappropriate because of the (wholly speculative) possibility that not *every*

15   Damages Subclass member may ultimately recover damages, e.g., because some

16   number of them may have replaced Regulators for reasons unrelated to the Defect.

17   _____

18   [26] That said, Honda and its experts parse the numbers in misleading and illogical ways in an attempt to manipulate them in their favor. For example, when data

19   indicated more than one Regulator was replaced on a Vehicle, Honda's expert Rose Ray inexplicably counted it as only one replacement. Ray Dec. ¶ 12. Honda and

20   Ray also entirely ignore the number of replacement Regulators sold by Honda when calculating what they purport to be the failure rate, despite the fact that that is the

21   only information Honda produced that captures outside-of-warranty failures. Martin Supp. Decl. Ex. C, Ray 2017 Dep. Tr. 31:23-32:05; Opp. 6 (completely ignoring

22   out-of-warranty failures). Yet in its own internal 2009 investigation into the Defect, Honda *did* consider outside-of-warranty failures. *See* Martin Supp. Decl. Ex. J,

23   Grodzitsky 051436 (" ███████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████ ").

25   Honda and Ray also manipulate the data in highly unscientific ways to make it fit the conclusions they want to reach. One ready example is Ray's contortion of the

26   warranty claims data to try to make it show that the failure rate does not increase over time or mileage, when every acceptable statistical analysis of the data shows

27   the opposite: that Regulator failure rate does increase over time, and with increased mileage – a result that makes sense given Akhavein's – and Honda's own –

28   findings about the effects of creep and fatigue on the performance of the Regulators. Wachs Rep. ¶¶ 10-47; Akhavein Supp. Rep. § 5.3.

The Ninth Circuit rejected this exact argument in *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016), holding that the presence in the class of some individuals who may not have been harmed by a defendant's wrongful conduct does not defeat predominance, and explaining that it is almost "inevitabl[e]" that "even a well-defined class" will include people who "suffered no harm as a result of a defendant's unlawful conduct." It then held that the mere fact "that an injurious course of conduct may sometimes fail to cause injury to certain class members" cannot "defeat predominance." *Id*. It specifically contrasted cases like this one, where class certification *is* appropriate because all class members were "*exposed*" to the same defect (whether or not it ultimately caused damages) with cases like those cited by Honda where "large numbers of class members . . . were never *exposed* to the challenged conduct to begin with." *Id.*

Here, every Class member purchased or leased a Vehicle equipped with the allegedly defective Regulators. And every Damages Subclass member suffered an actual failure for which they paid out of pocket. That Honda may, at some point, be able to show that some small number of those people experienced failure due to some other cause—and again, Honda has failed to establish any non-speculative explanation for widespread failures other than the Defect—does not change the analysis. Indeed, this case is even more clear-cut than *Mercer* because Plaintiffs here seek damages only for those who *actually experienced* a failure *as a result of the Defect*. And Honda itself has determined that between 71% (per its expert's analysis) and ██% (per its engineers) of those failures were caused by the Defect.

### a.     Plaintiffs Satisfy *Comcast*.

Honda argues that Plaintiffs fail to satisfy predominance because they have not presented any methodology for ensuring that damages would include only those "attributable to the theory of liability," because of the possibility that someone paid to replace a Regulator that failed for some reason unrelated to the Defect. Even assuming someone paid for a failure caused by something other than the Defect

(and Honda presents zero evidence of that), Honda is wrong. The Ninth Circuit has held that "the need for later individual damages calculations does not, alone, defeat class certification." *Vaquero v. Ashley Furniture Indus., Inc*., 824 F.3d 1150, 1155 (9th Cir. 2016); *Suchanek v. Sturm Foods*, 764 F.3d 750, 756 (7th Cir. 2014) ("It is routine in class actions to have a final phase in which individualized proof must be submitted."). The possibility that Honda may ultimately be able to show that a certain individual is not entitled to damages because she replaced her (uniformly defective) Regulator for reasons unrelated to the uniform Defect is immaterial to the propriety of class certification. Were it otherwise, then no vehicle design defect case could ever be certified because at least some vehicles will be destroyed in car crashes before a given defect manifests. And that is not the law. *See, e.g., Wolin*, 617 F.3d at 1173 (whether, when, how defect manifests does not affect whether vehicle had design defect); *Edwards*, 603 F. App'x at 540-41.

Honda attempts to avoid those holdings by presenting its argument as somehow deriving from the Supreme Court's decision in *Comcast v. Behrend*, 133 S. Ct. 1426 (2013). Honda mischaracterizes *Comcast*. *Comcast* means one thing in this context: "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Vaquero*, 824 F.3d at 1154-55 (post-*Comcast*); *accord, e.g.*, *Roach v. T.L. Cannon Corp*., 778 F.3d 401, 402 (2d Cir. 2015) (same); *Butler v. Sears, Roebuck & Co*., 727 F.3d 796, 800 (7th Cir. 2013) (same); *Whirlpool*, 722 F.3d at 860 (same). *Comcast* had nothing to do with the need to prove the right to damages at all; in that case, the plaintiffs presented damages models that had nothing to do with their theory of liability. This case would have a *Comcast* problem if, say, Plaintiffs argued that every class member should receive a free oil change, because that hypothetical theory of damages would be unrelated to the theory of liability. Plaintiffs' actual damages sought here do not present a *Comcast* problem. The liability theory is that Honda sold vehicles with defective Regulators. Plaintiffs seek as damages for themselves and the Damages

1    Subclass the money they paid out of pocket to replace failed Regulators.

2         Finally, even if there are failures caused by something else, *Honda will never*

3    *owe damages for any replacement unrelated to the Defect.* Assuming a jury finds in

4    favor of Plaintiffs on the issue of liability, every Class member will necessarily

5    have established that it is more likely than not that his or her individual failure was

6    because of the Defect—Honda itself says ██% of failures resulted from the Defect,

7    and its unsupported speculation as to other possible causes does not mean

8    otherwise. *Cf. Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1046-47 (2016)

9    (holding the type of proof admissible in an individual case must also be admitted in

10   a class case). Moreover, Honda will *still* have the right to challenge any particular

11   Class member's damages claim in a post-verdict damages prove-up. In short,

12   Plaintiffs' damages theory—reimbursement of Plaintiffs and Damages Subclass

13   members for the cost they paid out of pocket to replace failed Regulators—directly

14   flows from Honda's alleged bad conduct of selling cars with defective Regulators.[27]

15                    **b.    *Doyle* Supports Certification Here.**

16        Honda's attempted reliance on *Doyle v. Chrysler Grp., LLC*, 663 F. App'x

17   576 (9th Cir. 2016), is misleading and misplaced: *Doyle* supports Plaintiffs, not

18   Honda. In *Doyle*, the plaintiff sought "either full or partial reimbursement for the

19   purchase of the replacement regulator" on behalf of a class of owners/lessees of

20   certain Jeeps who "purchased a Replacement Regulator from, or otherwise had a

21   Replacement Regulator installed by, Chrysler[.]" *Id.* at 578-79. The Ninth Circuit

22   found this damages methodology failed to satisfy *Comcast* because Doyle had not

23   offered a model for determining what percentage of the purchase price the

24   reimbursement should be, leaving it unclear how damages would be calculated.

25   _____

26   [27] As noted above, the alternative damages model would force Honda to pay every
     purchaser/lessee the difference in value between a car with a defective Regulator

27   and one without, based on the differential at the point of sale. Requiring Honda to
     only reimburse those owners/lessees who paid out of pocket for actual failures is a

28   more conservative measure of damages that also ensures relief for those most
     directly affected.

But the Ninth Circuit specifically distinguished a case—such as this one— where Plaintiffs seek reimbursement of money paid by Class members to replace Regulators that failed due to the Defect and future injunctive relief. In particular, the Ninth Circuit explained that a "reimbursement theory of damages will benefit [] class members who had out-of-pocket expenses in connection with the installation of the replacement regulator," while class members who had not paid to have a replacement would benefit from a theory "seeking to force future repairs or payment of the cost of future repairs." *Id*. at 580. Those are precisely the two Subclasses Plaintiffs propose here. *Doyle* supports certification.

### c.  *Wolin* Supports Certification Here.

The Ninth Circuit's opinion in *Wolin* also supports Plaintiffs. In that case, the Ninth Circuit held that the district court erred by denying class certification as to the exact claims at issue in this case. *Wolin,* 617 F.3d at 1174 (reversing the denial of class certification under state consumer protection laws for failing to disclose an automobile defect). The Ninth Circuit explained that—for this claim—proof of manifestation in any particular vehicle does not overlap with the test for predominance. *Id*.

Honda, however, seriously misreads *Wolin*: Honda quotes from the portion of *Wolin* applicable to a particular written warranty at issue in that case. Opp. 19-20. Unlike the other *Wolin* claims, the claim based on that particular express warranty *did* have a threshold manifestation requirement written into the language of the warranty. 617 F.3d at 1174. *Wolin* specifically noted that it was this unique aspect of that express warranty that made it the only claim that might not be amenable to class treatment. *Id.* Honda is just wrong to cite it as applying to Plaintiffs' consumer fraud claims, which were certified in *Wolin*.

### 4.  Plaintiffs Establish that Common Issues Predominate as To Their CLRA and UCL Claims.

Honda argues that certification should be denied because Plaintiffs fail to

1   provide common proof for the elements of their CLRA and UCL claims,

2   specifically reliance, materiality, and causation. Opp. at 20-22. Again, the only

3   requirement at this stage is to establish common questions—i.e. those that could be

4   answered by common proof, after discovery. And while those common questions

5   must predominate, Plaintiffs are not required to show that every element of their

6   claims is susceptible to class-wide proof. *See Amgen*, 133 S. Ct. at 1196; *see also*

7   *Butler*, 727 F.3d at 801 (holding predominance inquiry is not "bean-counting"—

8   common issues need only predominate, not outnumber individual issues). That said,

9   Plaintiffs show that the questions of materiality, reliance, and causation here are

10  answerable by common proof.

11                        **a.      Materiality.**

12          Both the CLRA and the UCL allow plaintiffs to establish materiality and

13  reliance (i.e. causation and injury) by showing that a reasonable person would have

14  considered the defendant's misrepresentation material. *See, e.g., Forcellati v.*

15  *Hyland's, Inc*., 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014).

16          Because the objective "reasonable person" standard is the same for every

17  class member, a finding that the defendant failed to disclose information that would

18  have been material to a reasonable person who purchased the defendant's product

19  gives rise to a rebuttable inference of reliance as to the class. *See, e.g., Daniel v.*

20  *Ford Motor Co.,* 806 F.3d 1217, 1225 (9th Cir. 2015). "To prove reliance on an

21  omission, a plaintiff ... [may] simply prov[e] 'that, had the omitted information

22  been disclosed, one would have been aware of it and behaved differently.'" *Id.*

23  (quoting *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093 (1993)). "That one would

24  have behaved differently can be presumed, or at least inferred, when the omission is

25  material." *Id*.; *see also Engalla v. Permanente Med. Grp., Inc*., 15 Cal. 4th 951, 977

26  (Cal. 1997) (holding that with respect to fraud-based claims, "a presumption, or at

27  least an inference, of reliance arises wherever there is a showing that a

28  misrepresentation was material").

### b.    Reliance.

Materiality is generally a question of fact unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *Engalla*, 15 Cal. 4th at 977. Alleged defects that create "unreasonable safety risks" are material. *See, e.g., Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 917-19 (C.D. Cal. 2010).

The Regulator Defect plainly qualifies as an unreasonable safety risk. Indeed, the Court instructed the parties to *assume* that for the purposes of class certification. [Dkt. 76]. But, even without that assumption, Honda's documents and testimony from Plaintiffs and Akhavein show the Defect is a safety hazard. While Honda "vehemently" denies that here, Opp. 21, outside of this litigation Honda has taken the opposite position. In the context of an unrelated but analogous issue plaguing Honda Odyssey side windows, which caused the "window to stop working and prevented it from being rolled up or down," and even "fall into the door and shatter, causing driver distraction and/or injury," Honda found that issue to be such a serious safety risk that it issued a safety recall on it in 2011. Martin Supp. Decl. Ex. O. Yet in this litigation, Honda inexplicably argues the opposite: that the Defect is *not* a safety hazard, despite that the Defect, just like the Odyssey issue, causes the "window [to] suddenly drop into door" and "become inoperable," and "[t]he sudden impact of the window dropping and sudden wind noise, even at low speed is very startling" to drivers.[28] Akhavein also opined that the Defect is a safety issue.[29] And, all three Plaintiffs testified that they believe the Defect poses a safety risk.[30]

---

[28] Martin Supp. Decl. Ex. J, Grodzitsky 51436-83; Complaint re 2006 Honda Pilot on NHTSA database, NHTSA ODI No. 10650510 (complaint filed Oct. 27, 2014).

[29] *See* Akhavein Report § 6.2; Akhavein Supp. Rep. § 6.

[30] *See* Martin Supp. Decl. Ex. D, Anyiam Dep. Tr. 71:11-23 ("when you are driving and then all of a sudden you hear a loud noise, and that in itself is scary. And, secondly, you come to find out that your window is broken. … The glass is going to cut me in the car. Of course, it's unsafe."); Ex. E, Mason Dep. Tr. 127:4-13 (Defect is a safety risk because of driver distraction due to "big bang" of window falling into door); Ex. F, Pendarvis Dep. Tr. 114:10-115:15 ("I'm concerned with safety

1    Honda's expert Erich Joachimsthaler supported the notion that Honda's

2    failure to disclose safety information would have mattered to a reasonable

3    consumer. He testified that a brand like Honda's is a promise that a company makes

4    to the public,[31] and the quality promise inherent in the brand is the most important

5    factor in whether a consumer will decide to purchase a Honda.[32] And in fact, all

6    three Plaintiffs here testified that if Honda had disclosed the Defect to them prior to

7    purchasing their vehicles, they would have paid less for them, or would not have

8    purchased the vehicles at all.[33] That is enough. *Daniel,* 806 F.3d at 1225 ("A

9    plaintiff need not prove that the omission was the only cause or even the

10   predominant cause, only that it was a substantial factor in his decision.").

11   None of the cases Honda cites involved omissions of a safety defect, and in

12   those cases the plaintiffs' testimony did not otherwise establish materiality and

13   reliance.[34] Not so here, where evidence shows the omitted information concerned a

---

14   now. Because … knowing that the window could drop as it did, if we're driving in

15   a rain storm or… maybe large trucks blowing sand all over the car while driving down the freeway, if the other windows just happen to break and fall, who is sitting

16   in that seat next to that fallen window, I just feel that there's a potential.").

17   [31] Martin Supp. Decl. Ex. G, Joachimsthaler Dep. Tr. 138:3-6 ("…a brand builds an expectation in consumers. Generally, it builds a high expectation. That's why it's a

18   brand. … a brand is a promise."); *id.* 133:16-19 ("if you build a brand on a product that has issues, … an inferior product, you're communicating an empty promise.").

19   [32] Martin Supp. Decl. Ex. G, Joachimsthaler Dep. Tr. 95:13-99:19 ("[if] you don't have QDR [quality, dependability, reliability], you don't get a consideration [from

20   the consumer]. … you need to [project QDR] to be even considered.").

21   [33] *See* Martin Supp. Decl. Ex. D, Anyiam Dep. Tr. 166:6-10, 177:3-7 ("I believe that [the Regulator] was defective. And, as I indicated earlier, if I had known that

22   that was going to be a problem down the road, I probably would not have purchased the vehicle. … if I knew that that was a defective item, I probably would not have

23   purchased the car."); Ex. E, Mason Dep. Tr. 121:20-122:6, 126:13-127:2 (testifying that the fact that the Window Regulators would fail was something that he would

24   have liked to have known because "We are talking probably 3- to $400 [to have Regulator replaced], and that would have definitely been a negotiation point" on the

25   purchase price of the vehicle.); Ex. F., Pendarvis Dep. Tr. 129:8-19, 131:19-132:6 ("if you tell me that something you're about to buy, you know, it has a chance of

26   breaking down, I'd say … I want to pay less.").

27   [34] In *Baghdasarian v. Amazon*, 2009 WL 4823368, at *5 (C.D. Cal. Dec. 9, 2009), the plaintiff testified that he purchased products from Amazon for cost and security

28   reasons, not because of the shipping and handling policies at issue in that case. In *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502-03 (C.D. Cal. 2011), unlike here, the

1  safety defect, and all three Plaintiffs testified that they would not have purchased

2  their vehicles, or would have purchased them at a lower price, had they known of

3  the Defect prior to purchase. No more is required.

### c.  Causation

5  "[T]he causation required by Civil Code section 1780 does not make

6  plaintiffs' [CLRA] claims unsuitable for class treatment." *Mass. Mut. Life Ins. Co.*

7  *v. Superior Court*, 97 Cal. App. 4th 1282, 1292 (2002). For the majority of class

8  members, causation is shown through the materiality of the misrepresentations. If

9  materiality is shown, reliance and causation may be presumed as to the entire class.

10  *See Chamberlan v. Ford Motor Co*., 369 F. Supp. 2d 1138, 1145-46 (N.D. Cal.

11  2005) (citing *Mass. Mut. Life* at 1293). Where, as here, the alleged

12  misrepresentations are primarily defendant's failure to disclose problems with the

13  Class Vehicles, Plaintiffs must show that defendant had a duty to disclose, which,

14  again, may be proven through materiality. *See Parkinson v. Hyundai Motor Am.,*

15  258 F.R.D. 580, 596 (C.D. Cal. 2008). And defects creating "unreasonable safety

16  risks," as the one here, are considered material. *Ehrlich*, 801 F. Supp. 2d at 917-19.

17  Honda's argument that Plaintiffs ask the Court to assume Honda had a duty

18  to disclose is exactly backwards: the Court instructed the parties to assume, among

19  other things, that the Defect presents a safety issue, which in turn establishes a duty

20  to disclose under California law. [Dkt. 76.] On this point, too, Plaintiffs have shown

21  all that is required at this stage.

---

23  defendant introduced "persuasive" expert testimony that "consumers would not

24  likely notice warnings" and consumers may not have responded uniformly to that warning. *Fine v. ConAgra Foods, Inc.*, 2010 WL 3632469 (C.D. Cal. Aug. 26,

25  2010) concerned misstatements by a popcorn company in a press release; the court there agreed with defendants that most class members had never even seen the press

26  release, let alone based their popcorn purchases on it. In *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009), individual issues predominated because Vioxx

27  increased the risk of death only for some patients; some might take the drug without even knowing of the risks; and there were numerous variables concerning their

28  physicians' decision-making in prescribing the drug, all of which made materiality and reliance vary between patients. There are no such complicating factors here.

### C.   The Plaintiffs' Claims Are Typical of the Class.

Plaintiffs plainly establish—and Honda does not dispute—that the Plaintiffs' Regulator failures were due to the Defect. Plaintiffs also establish that the Regulators in Class Vehicles share a common design Defect. Even assuming for the sake of argument that there are Class members whose Regulators failed for reasons other than the Defect (again, no evidence supports this speculation), the Ninth Circuit has held that this does not undermine typicality. *See Wolin*, 617 F.3d at 1175 (rejecting defendant's argument that plaintiffs' claims were not typical because their tires showed wear that was not the kind attributable to defect).

Honda's argument that Anyiam and Pendarvis purchased their Vehicles used is equally unavailing. Courts have repeatedly held that "plaintiffs who purchased used cars, or who purchased cars from dealerships rather than directly from the manufacturer have standing to bring CLRA claims against manufacturers, even though they never entered into transactions directly with the manufacturers." *Butler v. Porsche Cars N. Am., Inc.*, 2016 WL 4474630, at *7 (N.D. Cal. Aug. 25, 2016). Further, what Plaintiffs knew or did not about the prior owners' use of their Vehicles is irrelevant to class certification. *Cf. Chamberlan*, 369 F. Supp. 2d at 1146 (questions re prior owners go to weight of evidence at merits stage).

Also unavailing is Honda's argument that Anyiam and Mason are not eligible for restitution under the UCL because they did not purchase their replacement regulators from Honda. Restitution under the UCL is restoring to direct victims of unfair practice the money or property lost as a result of that practice. Honda's authority, *Korea Supply Co. v. Lockheed Martin Corp.*, doesn't say otherwise. 29 Cal. 4th 1134, 1148-52 (2003) (holding that plaintiff-company could not recover monetary relief under UCL for alleged lost business opportunity due to unfair practice of a competitor, because "restitution is limited to restoring money or property to direct victims of an unfair practice" and "compensation for a lost business opportunity is a measure of damages and not restitution to the alleged

victims"). Here, Honda's actions caused Plaintiffs to pay out of pocket to replace defective failed Regulators, and therefore they are direct victims of Honda's unfair business practice of designing and selling Vehicles with defective Regulators. From whom the Class members bought the replacement part is irrelevant.

### D. A Class Action is Superior to Individual Actions.

Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Given the small size of each Class member's claim at issue here, a class action is the superior—indeed, the only—method of resolving these claims. This is so because a "'class action is the efficient procedure for litigation of… a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost on any one of them large enough to justify the expense of an individual suit.'" *Suchanek*, 764 F.3d at 759; *see also Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir. 2004) ("[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits" because of litigation costs). Individual suits, moreover, would burden the judiciary, which is contrary to the goals advanced by Rule 23. *See Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 946 (9th Cir. 2009) ("The overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy.").

### 1. The Number of Failures is Irrelevant to Superiority.

Honda argues that superiority is not met here because the number of Class members who allegedly "experienced the defect" is "tiny." Opp. 24. This is disingenuous. As discussed above, *every* Regulator is defective whether or not it has already failed because the Defect is the insufficient design of the Regulator. And Honda is wrong to say that only a tiny number of them have already failed: even the limited data produced shows that at least ███ Class Regulators have failed nationwide.[35] While Honda has not produced complete failure data broken

---

[35] Wachs Rep. ¶¶ 48-52 (calculation using new data Honda produced April 2017).

out by state, its sales data shows ██% of the Class Vehicles were sold in California, [Dkt. 272-7], so it follows that at least ██%, or roughly 14,000, such failures likely occurred in vehicles in the proposed Class. Moreover, Honda itself found the mounting number of failures to be so significant by 2009 that it launched the internal engineering investigation that ultimately uncovered the Defect, and then incurred the cost of making a design change to the Regulators.[36] Honda would not have invested such significant resources on a "tiny" problem.

Honda relies on *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practice & Prods. Liab. Litig.*, 288 F.R.D. 445 (C.D. Cal. 2013), to support its argument that a class action is not superior where the number of class members that actually suffered an injury due to the defect is "tiny." But in *Toyota* the number who actually suffered an injury *was* tiny, because Toyota had issued a national recall and submitted evidence that it rectified the alleged problem, leaving the majority of class members with defect-free brakes, and just a few with defect-related injuries or damages that occurred before the recall was issued. Here, Honda has not recalled the Class Vehicles or fixed them (nor even argued that it has), leaving all Class members at risk of future failures in addition to the many thousands of Class members who already paid to replace failed Regulators.

## 2.    Plaintiffs' Proposed Trial Structure Supports Superiority.

The superiority inquiry compares the efficiency of a class action to many individual actions, not no actions at all. But Honda has not identified or proposed any alternative adjudication method that would be superior to a class action here. Meanwhile Plaintiffs have presented the Court with a proposed trial structure tailored to the claims at issue here, presenting a manageable plan for a class trial on the common issues. [Dkt. 293-4]; *see, e.g., Pella*, 606 F.3d at 395–96 (noting approvingly of Plaintiffs' submitted sample trial plan with comparative legal analysis of each subclass state, suggestions of how the case could be tried in phases,

---

[36] *See* Martin Supp. Decl. Ex. J, Grodzitsky 51436-83; Ex. L, Grodzitsky 51386-99.

and statement of class structure and remedies). And courts regularly find vehicle defect class action cases like this one present no particular manageability issues for the court. *See Falco v. Nissan N. Am. Inc*., 2016 WL 1327474, at *13 (C.D. Cal. Apr. 5, 2016); *see also Wolin*, 617 F.3d at 1176.[37] The manageability of a class trial was clearly established by the recent class trial in *In re: Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig*., MDL. No. 2001; 1:08-wp-6500 (N.D. Ohio), where Whirlpool's liability regarding the claims of a class of Ohio purchasers of allegedly defective front-loading washers was tried to a jury in a three-week trial.

Post-trial, a claims process (for the Damages Subclass) and a future Regulator replacement program (for the Owner/Lessee Subclass) would allow individual Class members to present their proofs and Honda to refute any claim with specific evidence. All the "individualized issues" Honda conjures (which again are pure speculation) would be addressed during the post-trial claims process. The superiority requirement is well met here.

### E.    Plaintiffs Meet the Requirements of Rule 23(b)(2).

Plaintiffs also seek certification of a Rule 23(b)(2) subclass to provide, in effect, an extended warranty for future Regulator failures, *so long as those failures are a result of the Defect*. This is wholly separate from the Damages Subclass.

The Seventh Circuit approved a similar approach in *Pella*. There, plaintiffs owned allegedly defective windows that rotted at an accelerated rate. They sought certification of two classes: a Rule 23(b)(3) class of purchasers who had already paid to replace their rotted windows and a 23(b)(2) class of purchasers who had not

---

[37] Honda's authorities are distinguishable. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) was a products liability case concerning atrial leads where the court found a class action unmanageable because the plaintiff sought certification of a nationwide class for which 48 states' laws potentially applied; plus individual issues due to when and how the leads were implanted and how the patients were affected by them. In *Helm v. Alderwoods Grp., Inc.*, No. C 08-01184 SI, 2011 WL 855810 (N.D. Cal. Mar. 9, 2011), a wage-and-hour case, individual questions about what policies applied in which offices when and for whom and how individuals were compensated as a result defeated superiority.

1  yet replaced their windows (but might have to in the future). 606 F.3d. at 391.[38]

2  Honda's repeated attempts to argue that *Pella* does not apply fail.

3      First, Honda argues that a Plaintiff in this case could be a member of both the

4  (b)(2) and (b)(3) class, unlike the situation in *Pella*. But this is immaterial. There is

5  no prohibition on overlapping (b)(2) and (b)(3) class membership, only a

6  prohibition on overlapping compensation, which cannot happen here. *See Saltzman*

7  *v. Pella Corp*., 257 F.R.D. 471, 487 (N.D. Ill. 2009). In *Pella*, for example,

8  purchasers replaced *all* of their windows simultaneously when the defect

9  manifested in one particular window. In other words, members of the (b)(3) class

10  sought compensation for the cost of *all* of their windows (which they had paid to

11  replace). They thus could not also be part of the (b)(2) class because they were not

12  entitled to any additional relief. Here, by contrast, a plaintiff replaces only one

13  regulator at the time. It is therefore possible to be a member of the (b)(3) class to

14  recover the amount already spent on one Regulator *and* the (b)(2) class to obtain an

15  extended warranty on Regulators that have not yet failed. But there is no overlap of

16  claims, and thus no risk of overcompensation. Notably, the Ninth Circuit's opinion

17  in *Doyle* that Honda relies upon elsewhere supports precisely this two-theory

18  approach to relief. *Doyle*, 663 F. App'x at 580.

19      Second, Honda argues that an extended warranty is somehow monetary

20  compensation. But this is not a distinction from *Pella*—the exact same argument

21  was tried (and failed) there. And an extended warranty is *not* monetary relief. *See*

22  *id.* at 483 ("The relief for this class is declaratory and injunctive – not monetary. If

23  and when their windows manifest wood rot due to the alleged defect, they may file

24  a claim with Pella for service."). This case, moreover, is nothing like *Zinser*. There

25  the Court rejected the notion that a "the reserve *fund* … and *[monetary]*

26

27  _____

[38] That *Pella* was decided pre-*Dukes* matters not: it remains entirely appropriate post-*Dukes* to certify a 23(b)(2) class for injunctive relief alongside a separate

28  23(b)(3) class for damages. *See In re ConAgra Foods, Inc*., 90 F. Supp. 3d 919, 977 (C.D. Cal. 2015), *aff'd* 674 F. App'x 654 (9th Cir. 2017).

*compensation* for future medical treatment" was somehow not monetary. Honda's other case—*Cholakyan*—is even more off point. In *Cholakyan*, the plaintiff attempted to certify a (b)(2) class that would require the defendant to reimburse various (already paid) costs. *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 560 (C.D. Cal. 2012).[39] Here, Plaintiffs are not seeking money for the (b)(2) Subclass—they are seeking a declaration that Honda must replace any Regulator that fails because of the Defect. In other words, Plaintiffs seek the right to make a claim for a free service.[40] This is indistinguishable from *Pella*.

Finally, Honda argues a (b)(2) class is improper because it should not be required to replace Regulators that (it again speculates) may fail for reasons other than the Defect. This is nonsensical. Plaintiffs seek a prospective warranty program that covers failures *that result from the Defect*. When there is a failure, a member of the (b)(2) subclass will take their Vehicle to Honda for Regulator replacement. If, at that point, Honda finds the Regulator failed for an unrelated reason (e.g. the vehicle was in a collision), Honda would not be obligated to replace it for free under Plaintiffs' proposed injunction.

## IV.   <u>CONCLUSION</u>

Plaintiffs establish—with Honda's own internal engineering documents, as well as extensive new expert testing—that there is a common design Defect, among other common questions that predominate over any individual issues, and meet all other requirements of Rule 23. Honda's arguments ignore this substantial evidence and the controlling law on Rule 23. Plaintiffs' respectfully request that the Court grant their renewed motion for class certification.

---

[39] That—reimbursement of costs paid for past replacements—is what Plaintiffs are properly seeking to certify under 23(b)(3) on behalf of the Damages Subclass.

[40] And indeed it is only the right to make a claim, not the service itself, that is being sought here, because as explained above, if, at the time a Subclass member presents to claim service, there is evidence that the failure occurred for some reason other than the Defect, then that claim for free service can be denied.

1

2      Dated: July 3, 2017                    Respectfully submitted,

3

4                                             By: _____
                                                  Jonathan D. Selbin

5
                                              LIEFF CABRASER HEIMANN &
6                                             BERNSTEIN, LLP
                                              Jonathan D. Selbin (SBN 170222)
7                                             jselbin@lchb.com
                                              275 Battery Street, 29th Floor
8                                             San Francisco, CA 94111
                                              Telephone:   (415) 956-1000
9                                             Facsimile:    (415) 956-1008

10                                            Annika K. Martin (*pro hac vice*)
                                              akmartin@lchb.com
11                                            LIEFF CABRASER HEIMANN &
                                              BERNSTEIN, LLP
12                                            250 Hudson Street, 8th Floor
                                              New York, NY 10013-1413
13                                            Telephone:   (212) 355-9500
                                              Facsimile:    (212) 355-9592

14                                            Mark P. Chalos (*pro hac vice*)
                                              mchalos@lchb.com
15                                            Andrew R. Kaufman (*pro hac vice* forthcoming)
                                              akaufman@lchb.com
16                                            LIEFF CABRASER HEIMANN &
                                              BERNSTEIN, LLP
17                                            One Nashville Place
                                              150 Fourth Avenue, Suite 1650
18                                            Nashville, TN 37219-2423
                                              Telephone:   (615) 313-9000
19                                            Facsimile:    (615) 313-9965

20                                            Marc L. Godino (SBN 182689)
                                              mgodino@glancylaw.com
21                                            GLANCY PRONGAY & MURRAY, LLP
                                              1925 Century Park East, Suite 2100
22                                            Los Angeles, CA 90067
                                              Telephone: (310) 201-9150
23                                            Facsimile: (310) 201-9160

24                                            Jon A. Tostrud (SBN 199502)
                                              jtostrud@tostrudlaw.com
25                                            TOSTRUD LAW GROUP, P.C.
                                              1925 Century Park East, Suite 2125
26                                            Los Angeles, CA 90067
                                              Telephone:   (310) 278-2600
27                                            Facsimile:    (310) 278-2640

28

1222826.11                                    - 26 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

J. Barton Goplerud
goplerud@sagwlaw.com
SHINDLER, ANDERSON, GOPLERUD
AND WEESE, PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265-5749
Telephone: (515) 223-4567
Facsimile: (515) 223-8887

*Attorneys for Plaintiffs and the Proposed Class*

- 27 -